

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

DEC 15 2025

WEIMER, Clerk
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| KUN JIANG | * |
|     Plaintiff | * CASE NO: |
| V. | * **1:25 -CV- 7140** |
| CITY OF JOHNS CREEK, GEORGIA, and | * |
| OFFICER SHAFAA A SAMMANDER, | * |
| in his individual capacity; and | * |
| OFFICER TOMARIO ROWE, | * |
|   in his individual capacity | * JURY TRIAL DEMANDED |
|     Defendants | |

------------------------------------------------------------

## COMPLAINT

Plaintiff Kun Jiang, by and through himself proceeding pro se, brings this action against Defendants for violations of his Fourth and Fourteenth Amendment rights under 42 U.S.C.§1983, as well as related claims under Georgia law, arising from his wrongful arrest, malicious prosecution, due process violations and municipal liability under Monell.

## I. INTRODUCTION

1. Plaintiff is an immigrant with Tourette syndrome who was experiencing a mental health crisis on May 21, 2022. Defendants misinterpreted Plaintiff's neurological symptoms as disrespect or defiance and initiated a wrongful arrest driven by personal animus and incomplete understanding of Georgia battery law. They then completed the arrest by ignoring

overwhelming exculpatory evidence and continued the prosecution, causing severe and lasting harm.

2. Defendants arrested him without probable cause, and pursued a twenty-eight-month simple battery – family violence prosecution that was ultimately dismissed "in the best interest of justice" on October 8, 2024. (Exhibit A)

3. Defendants acted with malice, fabricating inculpatory evidence and suppressing exculpatory evidence and engaging in a cover-up in the Internal Affair investigation, while the city failed in its duties to hire, train, and supervise properly.

4. Plaintiff seeks compensatory and punitive damages, declaratory relief, and such other relief as the Court deems just and proper.

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a) because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related Georgia state-law claims, including O.C.G.A. § 51-7-40 (malicious prosecution).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all events occurred in Johns Creek, Fulton County, Georgia.

## III. PARTIES

### A. Plaintiff

7. Plaintiff Kun Jiang is an adult resident of Newark, Delaware. Prior to this incident, Plaintiff resided in Johns Creek, Georgia. Plaintiff is an immigrant from China with limited English proficiency.

2

### B. Defendant Officer Sammander

8. Defendant Officer Shafaa Sammander was a Johns Creek police officer acting under color of state law, sued in his individual capacity.

9. Defendant Sammander was previously employed as a police officer by Gwinnett County Police Department from 2011 to 2018 then by Johns Creek Police Department until resignation on March 31, 2023. Defendant Sammander is currently employed as a police officer in Cumming, Georgia.

### C. Defendant Officer Rowe

10. Defendant Officer Tomario Rowe was a Johns Creek police officer acting under color of state law, sued in his individual capacity.

### D. Defendant City of Johns Creek

11. Defendant City of Johns Creek, Georgia, is a municipal corporation organized and existing under the laws of the State of Georgia, responsible for its police officers' hiring, training, supervision, and policies.

## IV. COMPLIANCE WITH CONDITIONS PRECEDENT

12. On October 21, 2024, Plaintiff gave a written ante litem notice to The City in compliance with O.C.G.A. § 36-33-5, outlining the nature of the claims, damages, and the demand for compensation. (Exhibit B)

13. The City denied liability, exhausting administrative remedies and permitting this federal civil rights action.

## V. FACTUAL ALLEGATIONS

### A. Background: Plaintiff's Condition and Family Circumstances

3

14. Plaintiff has Tourette syndrome, an incurable neurological disorder characterized by involuntary tics including facial movements, muscle tension; these symptoms can be exacerbated by stress and can be misinterpreted by observers as signs of agitation, anxiety and irritability.

15. Plaintiff experienced severe emotional distress due to marital issues and his relationship with his young children.

**B.  The May 21, 2022 incident**

16. On May 21, 2022, Plaintiff had an argument with his wife over their teenage daughter, Plaintiff engaged in behavior characteristic of severe emotional distress, throwing household objects in frustration, not directed at any person.

17. Plaintiff's argument with his wife arose from his desire to encourage their teenage daughter to speak more confidently in public; he asked his wife to show their daughter a video on how to speak in public because he was concerned that his daughter was too shy and wanted to support her development. This context shows Plaintiff was acting out of concern as a father, not out of any desire to harm his wife.

18. Plaintiff's wife initiated physical contact and she aggressively grabbed Plaintiff's arms in an effort to stop him. Plaintiff attempted to break free and disengage;

19. Plaintiff did not intend to strike, injure, or insult his wife. There was no evidence of a deliberate, forceful shove, strike, or aggressive conduct by Plaintiff. At no time did Plaintiff state an intention to harm his wife physically.

20. Plaintiff's wife called 911. Because she has limited English proficiency, she used the word of "Domestic Violence" while she was telling the dispatcher her husband was throwing items. Her tone was calm and she refused EMS service; Dispatch coded the incident as a "domestic dispute."

4

21. Three officers responded to the call, including Defendants Officer Shafaa A. Sammander and Officer Tomario Rowe and another female officer Akins. B. The officers spoke with Plaintiff, Plaintiff's wife, and the two children (son S. J 11 years old, daughter N.J, 16 years old).

22. During the wife's conversation with the officer, she "appeared to be worried", no sign of fear though. Plaintiff's wife mentioned that Plaintiff believed he could be going through his "men's menopause period.".

23. During the officers' on-scene interviews, Plaintiff explained to both Officer Sammander and Officer Rowe the events truthfully: he admitted he had thrown items in the kitchen, but not at any person; he could have been mentally ill due to the marital strain and emotional stress.

24. Plaintiff denied deliberate physical contact with his wife. He described how his wife became physical first and "attacked" him by grabbing him and he was trying to disengage and get away from her (body-cam video timestamp 0:09:48). He said the words to the effect that "he would rather be locked up in prison than at this home".

25. With the heightened stress of this encounter and presence of the police officer, Plaintiff's Tourette's syndrome worsened which caused him to make frequent involuntary facial movements, including facial twitching, eyebrow raising, eye blinking…etc. visible to the officers and apparent on body-worn camera video. He started to speak in a hurried or uneven way at times because his Tourette caused an internal urge to rush his speech, making him look impatient and irritable. But Plaintiff's attempts to cooperate with officers were sincere; he answered questions and provided information about his job, family, and mental state. Plaintiff mentioned that he felt "trapped in this house" because he had to provide financially, and he had to work in New Jersey and he had found a better paying job pending upon

background check, and he also mentioned their failed divorce attempt in the past, and his wife chose to sleep with his son every night…. etc.

26. As Plaintiff's facial tics became more pronounced, Officer Sammander's expression tightened and showed clear irritation, and he gestured Plaintiff to slow down when Plaintiff was trying to recite his phone No.  Plaintiff observed Officer Sammander had a visibly annoyed and disapproving look on his face when he said "You look agitated" (timestamp 0:20:40). Plaintiff admitted he was agitated because he was not "normal". Plaintiff told Officer Sammander his son S. J saw what had happened.

27. Officer Sammander, likely unfamiliar with Tourette syndrome and failing to inquire about Plaintiff's medical condition, misinterpreted these involuntary neurological symptoms as signs of "agitation" or disrespect toward police authority. Given Defendants' crisis-intervention and mental-health training, a reasonable officer in Defendant Sammander's position would have recognized that such pronounced tics and distress could indicate a neurological or psychiatric condition rather than treating them solely as voluntary 'agitation' or defiance.

28. Officer Rowe next had a separate conversation with Plaintiff. Plaintiff told Officer Rowe that the family were going to have a vacation in Puerto Rico to celebrate his 53rd birthday (May 29) and his new job offer.

29. Plaintiff showed Officer Rowe a scratch on his arm (about 10 inches or longer) which he explained resulted from the wife's grabbing; Officer Rowe recognized the significance of this injury and photographed it using his body camera. The scratch was observable during the subsequent arrest in Officer Sammander's bodycam video footage (timestamp 0:35:24-0:36:17).

6

30. Officer Rowe recognized Plaintiff's mental health crisis. In response, Officer Rowe gave Plaintiff a GA crisis hotline card. (Exhibit C). this card is observable in the footage during the subsequent interactions.

31. Plaintiff's son S. J, then eleven years old, described both parents were "grumpy" and he saw his mother pull his father's arms to prevent him from throwing objects. When describing the physical contact between his father and mother, his body language and physical demonstration indicated minimal contact—not a violent shove or aggressive assault, but incidental contact consistent with someone trying to disengage from a situation.

32. A reasonable officer in Defendant Sammander's position should have recognized that an eleven years old boy, who still sleeps with his mother every night could be emotionally attached to his mother and may view the incident through his mother's perspective, and his statement may not be accurate.

33. Despite his earlier knowledge and the child's corroborating statement that the wife initiated physical contact, Officer Sammander proceeded to conclude that he had enough to make the arrest for simple battery. Plaintiff's wife did not understand the word "Simple Battery". The body-cam video shows Officer Sammander explained to the wife, in substance, that "Simple Battery is unwanted physical contact, even not leaving any mark…etc.", and the female officer confirmed that she had examined the wife's shoulder and found no marks. (time stamp 0:41:40), and the wife continued in her attempt to complain that her husband was throwing a hot water pot…etc.

34. Officer Sammander was heard later explaining to Officer Rowe that the wife's initiation of the physical contact was benign "She was trying to make him stop…etc." Officer Rowe was heard saying "cool…" with a smirk showing satisfaction when justification for the arrest was

found (0:38:00) despite he had known the visible injury on Plaintiff's arm and had concluded that this incident was caused by a mental health crisis. Officer Rowe did not inform Officer Sammander of the scratch injury at this point.

### C. Use of Force, Mockery and Humiliation

35. During the course of arrest, Officer Sammander declared he was arresting Plaintiff for "Simple Battery" but did not explain to Plaintiff what a simple battery charge was (0:33:50), and Plaintiff did not protest in real time due to his limited English proficiency.

36. Officer Sammander employed unnecessary physical force despite Plaintiff's visible compliance and lack of resistance. During the course of arrest, Officer Sammander forcefully pulled Plaintiff's left arm, causing sharp pain to his left shoulder, Plaintiff, in fear, did not verbally protest but reported it to Officer Rowe later. Plaintiff also mentioned months later his shoulder injury to his neighbor who worked at Emory Hospital as a teaching faculty.

37. When Plaintiff's shorts appeared wet from spilled water, Officer Sammander mocked him by asking, in a contemptuous tone, whether he had urinated on himself. Plaintiff clarified that it was water, but the officer's demeanor was scornful and demeaning.

38. Plaintiff was placed into the patrol car. Plaintiff complained to Officer Rowe that he was experiencing pain and asked the officer if he could be handcuffed without his arms being moved behind his back. Officer Rowe instead loosened up the handcuff. This interaction should have been recorded in Officer Rowe's body-worn camera since Officer Sammander was speaking with the wife inside the house, along with the female officer.

39. Officer Sammander's body-cam video shows he advised the wife to file a Temporary Protection Order (TPO) and both officers suggested she turn off her I-phone tracking when the wife told the officers that she believed her husband would return to kill her, and hurt the

kids and her dog. Officer Sammander also continued to predict that this arrest would cost Plaintiff a $5,000 fine and some jail time…etc.

40. A reasonable officer should at least make further investigations or question the wife's mental state and the apparently paranoid thoughts before he advised the wife to file a TPO.  If he had done any more investigation, he would have found out the dog is a rescue dog Plaintiff had adopted under his name and gave it to their son as his pet.

**D: Officers Ignored Exculpatory Evidence**

41. Before Plaintiff was taken to the jail, Officer Rowe and Officer Sammander exchanged words. Officer Sammander started to ask Plaintiff a number of routine questions including if he was injured, Plaintiff answered "NO" because his pain had disappeared after the handcuff was adjusted.

42.  Two officers started to speak in hushed voice and the recording became incoherent, Officer Rowe's face was shown partially on the video and it could still reveal he was likely smirking. Then, Officer Sammander was seen asking Plaintiff if he had any current injury as a result of what happened today, Plaintiff said "No" but mumbled in hesitation that "I was about to say something…I was about to something emotional etc." meaning he had told Officer Rowe earlier he was experiencing pain and he wanted to provide more information about his experience.

43. Officer Rowe was seen describing the mark on Plaintiff's arm and mentioned that "but I have already uploaded it…etc." (0:59:40). The footage shows Officer Sammander leaned over in an attempt to check on Plaintiff's arm, but he eventually ignored the evidence after saying "I'll look at it" and then Officer Rowe continued to describe how the tight cuffing occurred.

44. Officer Sammander was heard next telling Plaintiff that they were going to the Fulton County jail. During the approximately 30-minute transport to Fulton County jail, Officer Sammander was seen doing some paperwork while holding Plaintiff's driver's license and the GA Crisis Hotline card.

45. By this time, Officer Sammander had clear knowledge of the following facts: the wife initiated the physical contact; the wife had no physical harm; Plaintiff's statement of his unwell mental state; Plaintiff had a scratch on his arm, suggesting the contact was defensive; his fellow officer had concluded that this incident was a domestic disturbance related to mental health, not a domestic violence. In spite of all the facts known to him, Officer continued to complete the arrest by taking Plaintiff to the Fulton County jail.

46. While Plaintiff was handcuffed in the back seat, Officer Sammander turned toward Plaintiff with a smirk on his face and asked "Sir, you wonder where we are going?" (Timestamp 1:06:25) The body-worn camera did not capture Defendant's facial expression but did record his words; this exchange was later selectively mischaracterized in the internal-affairs report as Plaintiff inquiring about how long it would take to get to the jail, omitting the fact that Defendant initiated the question. Plaintiff started to realize the officer was mocking him. Plaintiff mentioned this as "words of Sarcasm" in his Internal Affair complaint filed later with Johns Creek Police Department

47. After arriving at the jail, the body-worn camera recording ended while Plaintiff was still seated in the patrol car. After the camera was turned off and just before walking Plaintiff through the jail door, Officer Sammander taunted Plaintiff by saying, in substance, "You said you wanted to be in jail, here you are." This comment was not captured on video but was described in Plaintiff's subsequent internal-affairs complaint.

### E. Initiation and Continuation of an unjustified prosecution

48. Notwithstanding the lack of injury on the wife, the wife's initiation of the contact and his "Supervisor" Officer Rowe had a different assessment of the situation, Officer Sammander relied upon his assumptions and a messy kitchen in determining the probable cause for the arrest, and later ignored the crucial evidence that only Plaintiff had an arm injury. Officer Sammander continued his "Double Down" to complete the arrest by booking Plaintiff into the jail and pressing e charge.

49. While also relying on the son's statement which described the minimal physical contact without mentioning any harmful intent, Officer Sammander did not list the child as a witness in his police incident report.

50. Accordingly, the facts known to Defendants at the time of arrest did not provide probable cause to believe Plaintiff committed simple battery under O.C.G.A. § 16-5-23

51. His Affidavit for arrest shows "said accused, Kun Jiang did intentionally pushed his wife on the shoulder during an argument", this statement shows his incomplete understanding of Simple battery statue and incorrect assumption in determining probable cause for the arrest.

52. Despite he had already made the determination that this incident was caused by mental health and required counselling, Officer Rowe did not timely inform Officer Sammander of the exculpatory evidence and stopped the arrest, and instead, he assisted in the arrest.

53. Officer Rowe did not use his supervisory role (as he was listed as the Supervisor in the Police Report) to demand Officer Sammander to conduct further investigation, instead, he allowed Officer Sammander to continue and complete the arrest after he ignored the exculpatory evidence.

54. All three officers' behaviors on scene demonstrates that none of them correctly understood how to apply the simple battery law in a situation where they had to make the arrest decision.

55. Under O.C.G.A 16-5-23(a). Simple battery requires intentional physical contact with another person of an insulting, provoking, or harmful nature. No officer ever saw any such conduct; no witness described harmful contact, and no injury was found on Plaintiff's wife; the police report acknowledged that the wife called 911 because "Lu said she was afraid Kun would continue to escalate and she called 911..." not because she had been "attacked"; when meeting with the officers, the wife "appeared to be worried" rather than to be frightened; the wife's own actions – approaching Plaintiff and physically grabbing his arms- are inconsistent with fear of imminent harm. Both officers had knowledge of the exculpatory evidence suggesting a defensive physical contact which can be justified under O.C.G.A. § 16-3-21(a) for self-defense "to the extent that he or she reasonably believes it is necessary to defend against another's imminent use of unlawful force". All these facts negate any inference of intentional battery.

56. While the officers observed a disarrayed kitchen, disorder in the home, without more, does not establish any element of simple battery under Georgia law and cannot supply probable cause.

57. Officer Sammander's remarks of " You look agitated", his scornful and demeaning demeanor and use of force  during the arrest, advising the wife to file TPO, accepting her paranoid thoughts on face value, predicting fines and jail time for Plaintiff, mocking and taunting during the transport  and at the jail door, suggest that his intent was driven by personal animus and his desire to punish Plaintiff for perceived disrespect for his policing authority, rather than objectively enforcing laws.

58. Plaintiff was detained for three days and was released in the early morning hours of May 24, 2022. The criminal prosecution was pending for more than two years. During this prosecution period, Johns Creek police department only produced Officer Sammander's

12

body-cam video in discovery, intentionally suppressing Officer Rowe's bodycam video footage that shows the exculpatory evidence and how officer Sammander reacted to Plaintiff's Tourette symptoms and the alleged "agitation".

59. During the period, despite Plaintiff's wife wrote multiple times to the state solicitors and asked that the charge be dropped, the State stonewalled the prosecution even though three solicitors worked on the case. Plaintiff maintained his innocence and declined the diversion offer.

60. In late August, 2024, Plaintiff filed pro se his motion to demand speedy trial. On August 28, 2024, Plaintiff submitted an Open Record request asking Johns Creek Police Department to provide Officer's Rowe Body-cam video footage. JCPD replied that the officer's video footage was deleted due to retention period.

61. The State dismissed this case on October 8, 2024, twenty-eight months after his arrest.

**D: May 24, 2022 incident**

62. On or around May 24, 2022, Plaintiff was escorted by Officer Sammander back to his house to get personal belongings. Officer Sammander showed hostility by closely following Plaintiff and constantly urging him to hurry up. Plaintiff was only able to stay in the house for like two or three minutes.

63. Officer Sammander instructed Plaintiff to drive the old Toyota Siena after he saw another Mercedes-Benz SUV in the garage and called Plaintiff's wife

64. After leaving the house, Plaintiff realized that Officer had not given back his cell phone and backpack. Plaintiff borrowed a phone and called 911 again. Officer Sammander returned, Plaintiff saw a smirk on his face and a hostile stare.

**E. Destruction of Evidence and biased Internal Affairs Investigation**

65. During the pendency of the criminal matter, Plaintiff filed an internal-affair complaint on April 3rd, 2023, describing the personal animus due to his agitation caused by Tourette symptoms, use of force, mockery and identifying the exculpatory evidence - specifically, Officer Rowe's body-camera photographs of his arm injury, additionally, Plaintiff wrote in his email: "I felt he hated me for some reason"

66. Plaintiff's complaint trigged Johns Creek Police Department to conduct an internal investigation. A senior Johns Creek Police Department officer, Matthew Stocks, alerted other officers in his email that Plaintiff was aware Defendant Sammander had resigned three days earlier, on March 31, 2023. This email shows that supervisory personnel and command staff had an intent to manage the situation rather than to conduct a fair and impartial investigation.

67. Defendant Rowe was assigned as the "Supervisor" to investigate Plaintiff's complaint despite the body-cam video shows Officer Rowe did not perform in any supervisory capacity on the incident day.

68. During the subsequent conversation and emails between Plaintiff and Officer Rowe, Plaintiff provided more details of the encounter on the incident day and his interaction with Officer Rowe, and requested Officer Rowe to help expedite the case or have the case dismissed if the arrest was unjustified.

69. About two months later (June, 2023), Officer Rowe informed Plaintiff in a call that that he did not find any misconduct involving officer Sammander, Plaintiff threatened he would sue.

70. The IA investigation report Plaintiff obtained later through Open Records Inquiry in September 2024 shows Officer Rowe reviewed Officer Sammander's body-cam video but failed to mention his own footage and the scratch injury despite he was heard saying "I have already uploaded it…etc." in the video.

14

71. He stated in his IA investigation report: "the only video available at the time of investigation was Officer Sammander's body camera footage", while failing to explain why his own body-worn camera footage was not available.

72. In response to Plaintiff's allegation about Officer Sammander's mocking and taunting during the transport to the jail, Officer Rowe mischaracterized the mocking as Plaintiff was inquiring how long it would take to get to the jail but failed to mention Officer Sammander initiated the conversation by asking "Sir, you wonder where we are going?"

73. Officer Rowe completely ignored the allegations about the taunting at the jail door, failing to mention that the bodycam recording ended while Plaintiff was still in the patrol car.

### F: City Customs and Policy

74. Through the Open Record request, 2024, Plaintiff attempted to request body-cam video footages from both officers, including Officer Rowe's body worn camera footage on the incident day and officer Sammander's video footage on May 24, 2022.

75. The City of Johns Creek later claimed Officer's Rowe's video footage, was deleted due to the retention period and Officer Sammander's May 24, 2022 body-cam video was unavailable

76. When asked why Officer Rowe's body-cam video footage was deleted while Officer Sammander's body-cam video from the same day was preserved, the city sent Plaintiff their policy showing the retention period for non-restricted category for arrests is 180 weeks, but failed to explain why Officer Rowe's body-cam video footage was deleted within only one year of the arrest.

77. Johns Creek Police Department had a custom or practice of only preserving the arresting officer's body-cam videos while the assisting officer's videos got purged. An internal Memo

15

from Lieutenant Ming Cha revealed: during the course of investigating Officer Seipp's complaint, Officer Sammander did not turn on his body-worn camera as a second unit.

78. The IA investigation report, prepared by Rowe, exonerated Sammander, Department leadership, including the police in chief concurred with Officer Rowe.

79. Open records show Officer Rowe was assigned to investigate multiple complaints against Officer Sammander and Officer Rowe exonerated Officer Sammander in each of these investigations

80. The fact suggests Johns Creek Police Department maintained a practice of assigning personally involved officers to investigate their own complaint, leading to conflict of interest and biased Internal Investigations.

81. Open records also show Officer Sammander accumulated multiple complaints for aggressive behaviors, excessive use of force, failure to use body-worn cameras …etc. during his employment with the Johns Creek Police Department. In each of these investigations, Officer Sammander was exonerated by his colleague and received no discipline.

82. Open records from Gwinnet Police Department where Officer Sammander worked prior to his employment with Johns Creek Police Department show multiple complaints against Sammander involving non-effective use of force and vehicle accidents that resulted in a written reprimand.

83. Despite his past records of misconduct, Johns Creek Department still hired Officer Sammander and failed to discipline or supervise him while he was employed by JCPD.

84. The Georgia Peace Officer Standards & Training Council (POST) requires Georgia police officers to complete annual training and requalification in subjects that include, among others: Autism and De-escalation; Building Positive Community Relations; Cultural

16

Awareness; Fostering Positive Community Relations; Mental Wellness; Police Legitimacy, Procedural Justice, and Community Relations; Serving Georgia's Diverse Communities; and Use of Force and De-escalation.

85. Officer Sammander's POST training record prior to May 2022 shows he did not complete the Mental Wellness course in multiple years, including 2019, 2020, 2022, and 2023, and there is no record that he completed Police Legitimacy, Procedural Justice, and Community Relations training, despite his role responding to domestic and mental health laden incidents in a diverse community.

86. Officer Rowe's POST training record similarly shows that he failed to complete required Mental Wellness or equivalent mental health training in multiple years including 2022, although he took such a course on March 17, 2021.

87. POST records further show that Defendants Sammander and Rowe completed only basic, checkbox POST mandated modules and did not receive ongoing, advanced training in applying probable cause standards to domestic incidents or in recognizing and differentiating mental health or neurological behavior from intentional disobedience or aggression.

88. The May 21, 2022 incident itself demonstrates that whatever training they received was superficial and ineffective: all three responding officers misapplied the legal elements of Georgia's simple battery.

89. In its 2023 Annual Report, JCPD reported 41 complaints and noted that at least one Level-1 complaint was sustained as a 'policy failure,' with multiple other complaints sustained; its 2024 Annual Report similarly reported 39 complaints and at least one sustained policy failure, suggesting a pattern of policy failures that could have existed long before the incident.

90. Furthermore, the department's culture was exemplified by a sexual harassment complaint against senior leadership in or around 2020, which was settled through a confidential agreement. A published Internal Investigation report which is available on the internet and media revealed a pattern of leadership misconduct and the department's inability or unwillingness to enforce accountability, thereby facilitating an environment conducive to constitutional violations.

91. The foregoing factual allegations are incorporated into each cause of action asserted below and provide the factual predicate for Plaintiff's claims that Defendants violated his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983, and for related Georgia state-law claims and the City's deliberate indifference to their policy failure or customs and practice is the moving force.

92. Plaintiff will present during discovery and at trial the available evidence, internal-police records and other documentation that corroborate his factual assertions.

## VI.    CAUSES OF ACTION

### COUNT I – Fourth Amendment Malicious Prosecution

### (42 U.S.C. § 1983 – Against Defendants Sammander and Rowe)

93. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

94. Plaintiff was seized pursuant to legal process when Defendants' warrant affidavit and charging decision caused him to be detained and prosecuted for more than two years.

95. As described in ¶¶48-55 in the factual allegation, Defendants Sammander and Rowe made the arrest without probable cause, in violation of the Fourth Amendment and 42 U.S.C. § 1983.

96. Defendants nevertheless relied on a child's statement to justify the arrest while failing to list the child as a witness, further undermining the transparency and reliability of their probable-cause narrative

97. Defendants fabricated or materially exaggerated facts in the incident report and intentionally suppressed the exculpatory evidence that suggests defensive physical contact. The use of force and humiliation during the arrest, mocking and taunting during transport, and smirking demonstrate malice. Advising the wife to file TPO, accepting her paranoid thoughts on face value and predicting fines and jail time for plaintiff, together suggest their malicious desire to punish Plaintiff rather than to enforce laws objectively.

98. Defendants' actions caused prosecutors to initiate and continue criminal proceedings against Plaintiff, which persisted for more than two years and caused severe and lasting damages

99. The prosecution terminated in Plaintiff's favor when the State dismissed the charge.

100.    Defendants' conduct was malicious and undertaken with reckless disregard for Plaintiff's constitutional rights.

WHEREFORE, Plaintiff seeks all available damages, punitive damages, and any relief permitted by law.

### COUNT II – Fourteenth Amendment – Deprivation of Liberty Without Due Process

### (Fabrication and Suppression of Evidence 42 U.S.C. § 1983)

### Against Defendants Sammander and Rowe

101.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

**Fabrication of Evidence**

102. The Fourteenth Amendment prohibits officers from fabricating evidence or knowingly providing materially false, incomplete, or misleading information to prosecutors or the courts.

103. Defendants fabricated and/or materially distorted evidence by selectively presenting facts, inaccurately characterizing Plaintiff's conduct, and presenting a misleading version of events to justify Plaintiff's arrest.

104. Defendants misrepresented the legal meaning of "simple battery" and omitted the fact that the child saw the wife pull Plaintiff's arm and the child demonstrated only minimal, incidental movement on the body-camera video. And Officers relied upon the child's statement but failed intentionally to list him as a witness.

105. Defendants' fabricated and misleading information was used to justify Plaintiff's arrest and was relied on to initiate and continue criminal prosecution against him and were material in that they were likely to influence the prosecutorial decision to initiate and continue charges

**Suppression of Evidence**

106. The Fourteenth Amendment prohibits law enforcement officers from suppressing, withholding, or failing to preserve exculpatory evidence they know would tend to negate probable cause or undermine a prosecution.

107. Defendants failed to preserve and disclose exculpatory evidence, including but not limited to:

   a. the photograph of Plaintiff's scratch taken by Defendant Rowe;

   b. Officer Rowe's body-camera footage relevant to the incident;

   c. Officer Sammander's body-camera footage on May 24, 2022.

108. Defendants knew or reasonably should have known that such evidence would tend to negate probable cause, support Plaintiff's account, and was material in that they were likely to influence decision to arrest and the prosecutorial decision to initiate and continue charges.

109. Defendants' omissions were deliberate or reckless, and violated due process under the Fourteenth Amendment, and contributed to the continuation of criminal proceedings for more than two years.

110. As a direct and proximate result of Defendants' fabrication and suppression of evidence, Plaintiff was deprived of liberty, suffered emotional distress, reputational harm, financial loss, and other damages.

WHEREFORE, Plaintiff demands compensatory damages, punitive damages, attorney's fees, and all other relief available.

### COUNT III — Malicious Prosecution (Georgia State Law O.C.G.A. § 51-7-40)

### (Against Defendants Sammander and Rowe)

111. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

112. Under O.C.G.A. § 51-7-40, a claim for malicious prosecution requires:

   a. that the defendant instituted, continued, or procured a criminal proceeding;

   b. without probable cause;

   c. (c) with malice;

   d. that the proceeding terminated in the plaintiff's favor; and

   e. that the plaintiff suffered damages.

113. Defendants Sammander and Rowe instituted, continued, and procured a criminal

prosecution for simple battery against Plaintiff by signing and submitting an arrest affidavit/warrant and providing false, incomplete or misleading information in the incident report and by omitting exculpatory facts.

114. As described in ¶¶48-55 in the factual allegations, Defendants lacked probable cause to initiate or continue the prosecution.

115. Defendants acted with malice, as shown by their reckless disregard for the truth, their deliberate failure to document and preserve exculpatory evidence, their mischaracterization of Plaintiff's defensive conduct, and their smirking, mocking, taunting and use of force.

116. The criminal prosecution against Plaintiff continued for more than two years and was terminated in Plaintiff's favor when the State dismissed the charge.

117. As a direct and proximate result of Defendants' malicious prosecution, Plaintiff suffered emotional distress, mental anguish, reputational harm, lost economic opportunities, and other damages recognized under Georgia law, including injury to his peace, happiness, and feelings.

WHEREFORE, Plaintiff demands judgment against Defendants Sammander and Rowe for compensatory damages, punitive damages under Georgia law, costs of litigation, and all relief the Court deems proper.

## COUNT V – Monell Liability

### (Failure to Hire, Train, Supervise, and Discipline 42 U.S.C. § 1983)

### – Against Defendant City of Johns Creek Only

118. Plaintiff incorporates all preceding paragraphs as though fully stated herein.

22

119.    As described in ¶¶65-90, the constitutional violations were caused by the City of Johns Creek's polices, customs, or deliberate indifference, including its failure to hire, train, supervise, discipline officers regarding:

(a) Ongoing training and supervision on mental-health and neurological conditions;

(b) use and retention of body-worn cameras and preservation of exculpatory evidence;

(c) hiring, retention, and discipline;

(d) internal-affairs investigations free of conflicts of interest; and

(e) constitutional limits on arrest and probable cause determination

The City's deliberate indifferences to that policy failure or deficient or defective customs and practices were the moving force behind the constitutional injuries Plaintiff suffered.

WHEREFORE, Plaintiff seeks compensatory damages, declaratory and injunctive relief as appropriate, attorney's fees, and all available relief.

## VII. DAMAGES

120.    As a direct and proximate result of Defendants' unlawful arrest of Plaintiff on May 21, 2022, the initiation and continuation of a baseless criminal prosecution that lasted more than two years, and the suppression and destruction of exculpatory evidence, Plaintiff suffered and continues to suffer substantial economic, physical, emotional, familial, and dignitary harm.

121.    Plaintiff was detained for three days, subjected to painful handcuffing that aggravated his Tourette symptoms, and transported and booked into jail, causing physical pain, exacerbation of neurological symptoms, humiliation, and fear.

122.    Plaintiff's wife obtained a TPO, in reliance of Officer Sammander's advice, which

effectively barred Plaintiff from the family home and from meaningful contact with his two children for nearly one year

123. In the subsequent divorce proceedings, the existence of the family-violence arrest, the pending criminal case, and the TPO that flowed from Defendants' actions were used against Plaintiff and contributed to him losing custody of his two children.

124. The family-violence simple-battery charge, warrant, TPO, and prolonged prosecution, combined with Defendants' false narrative portraying Plaintiff as the sole aggressor, have severely damaged Plaintiff's reputation, standing in the community, and criminal background record, creating a continuing stigma that follows him in employment and social contexts even after the dismissal of the charge.

125. Plaintiff has suffered severe emotional distress, including anxiety, depression, sleep disturbance, increased Tourette symptoms, and a pervasive sense of fear and mistrust of law enforcement and government institutions, as well as damage to family relationships and loss of enjoyment of life.

126. Economically, Plaintiff has incurred expenses for criminal defense, divorce and family-law proceedings, and related litigation, as well as costs associated with relocating and attempting to rebuild his life and career after leaving Johns Creek.

127. Plaintiff previously worked in a technical professional field and was in the process of starting a new job that pays $145K annually with great benefits, contingent on a background check. Plaintiff was not able to pass the Public Trust clearance background check with the arrest and pending criminal charge, and the employer retracted the job offer.

128. Plaintiff was laid off around Nov 2023 and was not able to secure another employment

for one year because employers refused to consider him for employment due to the pending criminal case. The arrest, warrant, TPO, and prolonged prosecution permanently damaged Plaintiff's employability in his technical industry to the point that he has been unable to obtain comparable technical employment, is presently unemployed, and reasonably believes he has effectively been forced into premature, involuntary retirement from his technical career.

129. As a result, Plaintiff has suffered and will continue to suffer substantial past and future lost wages, lost earning capacity, lost benefits, and loss of professional status and advancement opportunities.

130. Plaintiff has been receiving mental health therapy in Delaware since October, 2024

131. The actions of Defendants Sammander and Rowe, including mocking and taunting Plaintiff during and after his arrest, intentional fabrication of evidence and suppression of exculpatory evidence, and participation in a biased internal-affairs process, were willful, wanton, malicious, and in reckless disregard of Plaintiff's constitutional rights, thereby warranting an award of punitive damages against them in their individual capacities to punish and deter similar misconduct in the future.

132. The policies, customs, and practices of the City of Johns Creek described in this Complaint were the moving force behind these injuries and entitle Plaintiff to recover compensatory damages, as well as declaratory and injunctive relief to prevent similar harms to others.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against all Defendants on all counts;

25

B. Award Plaintiff compensatory and punitive damages in an amount to be determined at trial

C. Issue a declaratory judgment that Defendants violated Plaintiff's constitutional rights;

D. Award Plaintiff his costs and expenses, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1983 and other applicable law;

E. Award pre-judgment and post-judgment interest as allowed by law; and

F. Grant such other and further relief as this Court deems just and proper.

## X. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this ___ day of _____, 2025.

_____

Kun Jiang

Pro Se Plaintiff

17 Cornwallis Sq, Newark, DE 19713

Email: akjiang@gmail.com

Cell Phone: 646-417-3968

## Exhibits:

Exhibit A: NOLLE PROSEQUI

Exhibit B: Ante Litem

Exhibit C: GA Crisis Hotline Card

# VERIFICATION

I, Kun Jiang, declare under penalty of perjury under the laws of the United States of America that I have read the foregoing Complaint, that I know the contents thereof, and that the same is true of my own knowledge, except as to those matters stated upon information and belief, and as to those matters, I believe them to be true.

Executed this ___ day of _____, 2025, at City_____    State:.

_____

Kun Jiang

Pro Se Plaintiff

17 Cornwallis Sq, Newark, DE 19713

Email: akjiang@gmail.com

Cell phone: 646-417-3968

27

Exhibit A

FILED
CRIMINAL DIVISION
10/08/2024 17:38:18
DONALD TALLEY
CLERK STATE COURT OF
FULTON COUNTY, GEORGIA

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

STATE OF GEORGIA,

v.

Kua Jiang .
Defendant

ACCUSATION NO. 22CR003201C

OFFENSE(S) Simple Battery
- Family Violence

## ENTRY OF NOLLE PROSEQUI

NOW COMES, the State through the Office of Solicitor General in open court and prior to jeopardy attaching and submission of the offense(s) to a jury and enters a nolle prosequi on the above referenced offenses on the following grounds:

( ) Although there was sufficient probable cause for the charges, the evidence is insufficient to prove guilt beyond a reasonable doubt. Record is Restricted.

(X) An assessment has been made by the prosecutor and it is determined that in the best interest of justice the prosecution should be terminated. Record is Restricted.

( ) The Defendant met all requirements of a pretrial intervention, counseling or treatment program. Record Restricted

( ) The conduct which resulted in Defendant's arrest was a part of a pattern of criminal activity which was prosecuted in another court of this State. Record is not Restricted.

( ) The plea agreement resulted in dismissal of one or more charges and conviction of one or more charges which are all a part of the same underlying transaction which gave rise to the prosecution. Record is not Restricted.

( ) The State was barred from introducing material evidence against the Defendant on legal grounds, including but not limited to the granting of a Motion to Suppress or Motion in Limine. Record is not Restricted.

( ) The defendant has diplomatic, consular, or similar immunity from arrest/prosecution. Record is not Restricted.

Assistant Solicitor-General

## ORDER CONSENTING TO ENTRY OF NOLLE PROSEQUI

After examination of the above and foregoing case in open court, before attachment of jeopardy and submission of the case to a jury, the court hereby consents to the prosecutor's entry of a nolle prosequi on the above referenced offense(s).

This 8th day of October, 2024.

JUDGE, STATE COURT OF FULTON COUNTY

 Gmail

Kun Jiang <akjiang@gmail.com>

---

## Claim against City of Johns Creek - claim number F4C4077
1 message

**Schimonsky, Kellie** <KSCHIMON@travelers.com>                    Fri, Nov 15, 2024 at 4:58 PM
To: "AKJIANG@GMAIL.COM" <AKJIANG@gmail.com>

Good afternoon Mr. Jiang. Please forward me all the information you have related to your claim against the City of Johns Creek.

Thank you.

Kellie Schimonsky | Claim Professional

Travelers/The Charter Oak Fire Insurance Company

Mid-Atlantic Claim Center

W: 610.371.7693   F: 800.804.3653

Mailing address:

P.O. Box 430

Buffalo, NY  14240-0430

If further assistance is required, please contact my manager, Greg Smiley, at gsmiley@travelers.com or 210.525.3702.

 **TRAVELERS**

 ⓕ ▶ 𝕏 in ⓞ ⓟ

---

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.

TRVDiscDefault::1201

Exhibit C

